Argued and submitted June 25, affirmed November 5, 2003

Charles HEGELE,
*Petitioner,*

*v.*

CROOK COUNTY,
Alan Russell, Joyce Russell,
Tom Strand, Carol Strand, Joneen Calhoun,
Terry C. Smith, Patricia Smith,
Ty Fehrenbacher, Linda Fehrenbacher,
Gerald A. Coffman, Marion Coffman,
Paul Kasberger, Ann Kasberger,
Michael Duggan, Diann Duggan,
Rodd Clark, and Jennifer Clark,
*Respondents.*

2002-139; A121356

78 P3d 1254

Bruce W. White argued the cause and filed the brief for petitioner.

Jeff M. Wilson, Crook County Legal Counsel, argued the cause and filed the brief for respondent Crook County.

No appearance for respondents Alan Russell, Joyce Russell, Tom Strand, Carol Strand, Joneen Calhoun, Terry C. Smith, Patricia Smith, Ty Fehrenbacher, Linda Fehrenbacher, Gerald A. Coffman, Marion Coffman, Paul Kasberger, Ann Kasberger, Michael Duggan, Diann Duggan, Rodd Clark, and Jennifer Clark.

Before Deits, Chief Judge, and Linder, Judge, and Leeson, Judge pro tempore.

LINDER, J.

**LINDER, J.**

Petitioner Charles Hegele applied to respondent Crook County for approval of a comprehensive plan amendment to place his aggregate mine on the county's Goal 5 inventory of significant aggregate sites. Petitioner also sought a conditional use permit to mine the site. The county determined that petitioner's aggregate site was not a significant resource and denied the application to place the site on its inventory. On petitioner's application, the Land Use Board of Appeals (LUBA) reversed that determination and remanded the case for further proceedings. LUBA did not, however, agree with petitioner about how the county was to identify conflicts between the proposed use of the aggregate site and existing residential uses in the vicinity. We write to address whether, for purposes of identifying conflicts pursuant to OAR 660-016-0005,[1] a local government may consider both the visual impact of a Goal 5 aggregate site on nearby residential uses and the impact of those residential uses on the Goal 5 aggregate site.[2] LUBA appears to have concluded

---

[1] OAR 660-016-0005 provides:

"It is the responsibility of local government to identify conflicts with inventoried Goal 5 resource sites. This is done primarily by examining the uses allowed in broad zoning districts established by the jurisdiction (e.g., forest and agricultural zones). A conflicting use is one which, if allowed, could negatively impact a Goal 5 resource site. Where conflicting uses have been identified, Goal 5 resource sites may impact those uses. These impacts must be considered in analyzing the economic, social, environmental and energy (ESEE) consequences:

"(1) Preserve the Resource Site: If there are no conflicting uses for an identified resource site, the jurisdiction must adopt policies and ordinance provisions, as appropriate, which insure preservation of the resource site.

"(2) Determine the Economic, Social, Environmental, and Energy Consequences: If conflicting uses are identified, the economic, social, environmental and energy consequences of the conflicting uses must be determined. Both the impacts on the resource site and on the conflicting use must be considered in analyzing the ESEE consequences. The applicability and requirements of other Statewide Planning Goals must also be considered, where appropriate, at this stage of the process. A determination of the ESEE consequences of identified conflicting uses is adequate if it enables a jurisdiction to provide reasons to explain why decisions are made for specific sites."

[2] Petitioner's other assignments of error raise issues that are more properly addressed by the local government in the first instance. In light of LUBA's remand to the county court, we decline to address those issues on review.

that a local government may engage in such a "two-way conflict" analysis for purposes of *identifying* conflicts. We disagree with LUBA's analysis on that point, and we write to explain the correct analysis. We affirm, however, LUBA's order remanding this matter to the county court.

The subject property is a 276-acre tract that is zoned for exclusive farm use (EFU-2) and is located in the Lone Pine Valley (the valley), an area of Crook County. Of the 276 acres, approximately 100 acres are located on the valley floor and are irrigated and cultivated for alfalfa production. The remainder of the property slopes uphill along the eastern flank of the valley. Petitioner proposes to mine a 24-acre site along the toe of that eastern flank, in the south-central area of the property. The surrounding land, also zoned EFU-2, consists of irrigated farms on the valley floor and dry hillsides used for limited grazing. There are 20 farm dwellings within one mile of petitioner's property. The nearest neighboring dwelling is approximately 1,500 feet from the proposed mine.

As noted, petitioner applied for a comprehensive plan amendment to place a 24-acre portion of his property on the county's inventory of significant aggregate sites. Petitioner also applied for a conditional use permit to operate the proposed mine. The county planning commission denied petitioner's applications, and petitioner appealed to the county court. After conducting a hearing *de novo*, the county court affirmed the denial of petitioner's applications on the ground that petitioner had failed to demonstrate that the proposed resource was significant enough to be included on the county's Goal 5 inventory of significant aggregate sites. The county court based that determination on (1) conflicts between the proposed mining activities and surrounding uses; and (2) its finding that there was no "public need" for an additional aggregate site in the county.

Petitioner appealed the county court's decision to LUBA. LUBA agreed with petitioner that the county erred in refusing to include petitioner's proposed aggregate site on the county's inventory. Petitioner also argued to LUBA that, in

identifying conflicting uses for purposes of OAR 660-016-0005, the county could consider only the impact of surrounding uses on the Goal 5 resource site and not the impact of the proposed Goal 5 resource site on surrounding uses. Petitioner pressed that issue because, in rejecting the request for a comprehensive plan amendment, the county had appeared to rest its decision on alternative grounds: (1) that the proposed aggregate site should not be placed on the county's inventory; and (2) that the proposed aggregate site would negatively impact other permissible uses in the zoning district, particularly the scenic values of residential uses in the entire Lone Pine Valley. LUBA reached the question of what conflicting uses the county could consider, because the answer to that question would have direct bearing on remand—*i.e.*, on the planning steps that the county had to take in light of the decision that the proposed aggregate site properly had to be placed on the inventory.

The portions of LUBA's analysis describing petitioner's argument and LUBA's answer to it are helpful to set forth at some length:

"Further, petitioner argues that * * * the county erred in considering such residential uses to be 'conflicting uses' for purposes of OAR 660-016-0005. According to petitioner, the focus of OAR 660-016-0005 in the context of a PAPA [post-acknowledgment plan amendment] to mine mineral or aggregate resources is not to identify surrounding uses impacted *by* extraction of the resource, but rather to identify surrounding uses that could 'negatively impact' extraction of the resource. To the extent impacts on residential uses can be considered, petitioner argues, the threshold for such impacts must be high enough to involve negative impacts to the proposed mining itself. In other words, petitioner argues, impacts on residential uses must rise to the level of nuisance or trespass claims that might be filed against the proposed mining, before residential uses may be said to be 'conflicting uses.' Petitioner submits that the visual impacts identified in the county's decision do not rise to that threshold.

"* * * * *

"* * * [W]e generally agree with the county that nothing in OAR 660-016-0005 limits either the size of

the impact area or the types of conflicting uses that can be considered. The county evidently considers visual impacts of the proposed mining on residential use in the valley to be a 'conflicting use.' * * * We disagree with petitioner that conflicts with residential uses may be considered under OAR 660-016-0005 only if they rise to the level of nuisance or trespass claims against the proposed mining. OAR 660-016-0005(2) makes it clear that both 'impacts on the resource site and on the conflicting uses must be considered in analyzing the ESEE consequences,' and does not impose any explicit threshold on either set of impacts. The ESEE analysis examines economic, social, environmental, and energy consequences of the conflicts between the resource site and other uses. The scope of analysis under OAR 660-016-0005(2) is quite broad, which suggests that the scope of conflicts that may be considered is far broader than the nuisance or trespass concerns that petitioner cites as the applicable threshold."

*Hegele v. Crook County*, 44 Or LUBA 357, 375-77 (2003) (emphasis in original). Ultimately, LUBA remanded petitioner's application to the county for further proceedings.

Petitioner seeks judicial review of LUBA's final order, challenging, *inter alia*, LUBA's apparent determination that, at the conflict-identification stage, a local government is not limited to considering only the impact of surrounding uses on the Goal 5 resource site. Specifically, petitioner argues that, at the conflict-identification stage, a local government may consider only the impact of the surrounding uses on the Goal 5 resource site and may not consider the impact of the Goal 5 site on the surrounding uses. In response, the county argues that petitioner's understanding of the conflict-identification process under OAR 660-016-0005 is "hyper-technical" and that neither LUBA nor the courts have so limited the initial identification of conflicts.

The Goal 5 planning process, as outlined in the pertinent rules, involves four basic steps. First, the local government is to adopt an inventory of Goal 5 resources within its jurisdiction. OAR 660-016-0000. As it applies to aggregate sites, that process includes collecting information on potential Goal 5 sites and determining whether the location, quantity, and quality make the site a significant aggregate site.

Next, if the aggregate site is added to the jurisdiction's inventory, the local government must then "identify conflicts with inventoried Goal 5 resource sites." OAR 660-016-0005. Third, the local government must determine the economic, social, environmental, and energy consequences of the conflicting uses on the Goal 5 resource site—the so-called ESEE study. As part of that assessment of negative impacts, "[b]oth the impacts on the resource site and on the conflicting use must be considered * * *." OAR 660-016-0005(2). Fourth, and finally, the local government must develop a program to achieve the goal, which can include protecting the resource site, allowing the conflicting uses fully, or limiting conflicting uses. OAR 660-016-0010.

■■ As noted above, the question that we must resolve concerns the second step of the process—*i.e.*, the identification of conflicts. OAR 660-016-0005 provides, in part:

"It is the responsibility of local government to identify conflicts with inventoried Goal 5 resource sites. This is done primarily by examining the uses allowed in broad zoning districts established by the jurisdiction (e.g., forest and agricultural zones). A conflicting use is one which, if allowed, could negatively impact a Goal 5 resource site. Where conflicting uses have been identified, Goal 5 resource sites may impact those uses. These impacts must be considered in analyzing the economic, social, environmental and energy (ESEE) consequences[.]"

By its terms, then, the rule requires local governments to "identify conflicts" with inventoried Goal 5 resource sites. The primary—but not exclusive—way that local governments are to accomplish that is to examine "allowed" uses—that is, legally permissible ones. A "conflicting use" is expressly identified as one that, if allowed, "could negatively impact a Goal 5 resource site." Significantly, the rule does not include in the definition of a "conflicting use" an allowed use in the zoning district that could be negatively impacted by the Goal 5 resource. Finally, the rule acknowledges that "Goal 5 resource sites may impact" identified conflicting uses and directs that such impacts be considered in an ESEE study.[3]

---

[3] At first blush, the statement in the rule that "Goal 5 resource sites may impact" identified conflicting uses permits two competing meanings. The "may"

By its terms, the text of the rule compels us to conclude, contrary to LUBA's conclusion, that in the second step of the process—identifying conflicting uses—the local government may consider only other allowable uses that have a negative impact *on* the Goal 5 resource. That conclusion follows from the plain meaning of OAR 660-016-0005, quoted above, which expressly identifies "conflicting uses" as ones that, "if allowed, could negatively impact a Goal 5 resource site." Subsection (2) then further provides that, "[i]f conflicting uses are identified," the impacts on both the resource site and on the conflicting use must be considered in analyzing the ESEE consequences, which is the third step of the process. Thus, the structure of the rule makes clear that two-way impacts are considered, but only in analyzing ESEE consequences and only for those allowable uses that qualify as conflicting uses because they will have a negative impact on the Goal 5 resource. The rule's express terms preclude LUBA's apparent contrary understanding—that is, that conflicting uses include uses that are negatively impacted *by* the Goal 5 resource and have no negative impact *on* the resource site.

■    The remaining question is: What types of negative impacts *on* a Goal 5 resource properly may be considered under the rule? Petitioner acknowledges that those impacts will "vary according to the type of resource at issue." But petitioner argues, as he did before LUBA, that, "given the dynamics between a mining site and a neighboring residence, the only manner in which a nearby residential use could negatively impact a mining site [is] if the impacts of the mining site on the residential use were to give rise to some legal action that could cause the mining activity to be curtailed—in particular, common law actions for nuisance or trespass."

could mean "legally permissible"—*i.e.*, the Goal 5 resource legally is permitted to impact competing uses in the district. Or the "may" could be a reference to what is possible in practical and factual terms—*i.e.*, the Goal 5 resource possibly will also impact the competing uses. In context, it is clear that the language means the latter only. Under OAR 660-016-0005(2), the ESEE process requires balancing the negative impacts of the competing uses on the Goal 5 resource against those of the Goal 5 resource on the competing uses. Under OAR 660-016-0010, the ESEE balancing process can lead to a plan to do any of three things: protect the resource site; protect the competing uses fully; or limit the competing uses fully. Necessarily, then, the statement that conflicting uses "may be impacted by the Goal 5 resource site" cannot mean that the Goal 5 resource site legally may do so in such a way that the competing resources will always give way to protection of the Goal 5 resource.

In that regard, we agree with LUBA that the rule is worded to encompass a broad range of negative impacts; it is not limited to impacts that would actually curtail the use of the Goal 5 resource or would alter the legal rights and liabilities of persons in their ownership or use of the resource site. In fact, the rule is clear that an actual conflicting use need not even exist at the time that the local government sets out to identify conflicting uses. The rule states that a conflicting use is one that, "*if* allowed, *could* negatively impact a Goal 5 resource site." OAR 660-016-0005 (emphasis added). "Negatively impact" is not defined in the rule, nor is it qualified or limited. That lack of qualification or limitation makes sense: the range of Goal 5 resources and allowed uses that may exist in broad zoning districts is so vast as to be all but impossible to catalog or describe in advance. Petitioner recognizes as much by acknowledging that the "nature of the impact will vary according to the type of resource at issue." The inquiry requires case-by-case assessment, and local governments are free to consider any and all negative impacts on a Goal 5 resource site that *could* arise *if* an allowable use were to exist in the zoning district along with the Goal 5 site.

Such impacts therefore could include, among others, legal, social, or economic ones. That understanding is reflected expressly in OAR 660-016-0005(2), which provides that, once the conflicting uses have been identified, and negative impacts are to be balanced, the local government must consider the "economic, social, environmental and energy" impacts of the Goal 5 resource and the competing uses alike. Legal consequences potentially qualify as economic and social ones, and curtailing use of a resource site through a nuisance or trespass action therefore readily falls within the range of contemplated impacts. But so do a wide variety of other impacts, such as social pressures that could come to bear within the zoning district in an effort to restrict, confine, or limit activity on the Goal 5 resource site.[4] In other words, when the negative impacts *of* the Goal 5 resource likely will

---

[4] For example, if operation of an aggregate mine (a Goal 5 resource) were predicted to engender social protests or economic boycotts because of perceived negative impacts of the resource on local residents, such activity might be deemed a "negative impact" on the Goal 5 resource itself.

create social, legal, or other pressures that can result in negative impacts *on* the Goal 5 resource.

We therefore reject petitioner's argument that the only negative impacts *on* a Goal 5 resource that permit identifying something as a conflicting use are trespass or nuisance actions that would impose legal burdens and liabilities on the Goal 5 resource site. The rule is not so limited but is, instead, written in broad terms to permit consideration of all negative impacts that allowed or allowable uses in the zoning district may have on the proposed resource site.

To be sure, there may be little difference in practice between the approach that LUBA articulated and the approach that we conclude the rule requires. It may well be that most or all allowable uses that are negatively impacted *by* the Goal 5 resource site reasonably can be expected to give rise, in response, to some form of negative social, economic, or legal pressure *on* the resource site. But the express terms of the rule require first an identification of the impact on the Goal 5 resource. The fact that such pressure originates as a reaction to the impact of the Goal 5 resource site on surrounding uses does not become relevant until the next step in the Goal 5 inventory process, when the local government considers the economic, social, environmental, and energy consequences of the conflicting uses.

In sum, we interpret OAR 660-016-0005 consistently with its wording. To be identified as a conflicting use, the allowed or allowable use must have a negative impact *on* the Goal 5 resource site. But also consistently with the rule's wording, the negative impacts that a local government may consider in that regard are not limited to legal burdens that might arise from nuisance and trespass actions. Rather, the local government may consider *any* negative impacts of an allowable use, which can include, but is not limited to, impacts of a social, legal, economic, and environmental nature. If, on the basis of such an impact, the local government identifies one or more allowable uses as conflicting uses, it goes on to the third step of the planning process (the ESEE study). Only at that third step of the planning process does the inquiry expand to encompass two-way negative impacts, that is, the impacts of the conflicting uses on the

Goal 5 resource, as well as the impacts of the Goal 5 resource on the conflicting uses. OAR 660-016-0005(2). *See Palmer v. Lane County*, 29 Or LUBA 436, 439 (1995) ("The delineation of an impact area serves both to protect existing conflicting uses from the impacts of developing a Goal 5 resource and to protect the resource itself from the encroachment of future conflicting uses.").

Beyond that general guidance, it must be for the local governments to identify uses that "negatively impact" a Goal 5 resource site in the first instance. LUBA appropriately remanded this case to the local level for that inquiry.

Affirmed.