ARMSTRONG, P. J.
*318 Deschutes County seeks review of a Land Use Board of Appeals (LUBA) order remanding the county's decision to amend the county's comprehensive plan and land use regulations to allow churches, without limitation, in the county's Wildlife Area Combining Zone (WA overlay zone), which was an amendment to the county's Statewide Planning Goal 5 program. The county had amended the Goal 5 program based on its economic, social, environmental, and energy (ESEE) analysis, which included as an economic consequence of not amending the program the threat of litigation under the federal Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 USC § 2000cc et seq. On the petition of Central Oregon LandWatch (LandWatch), LUBA remanded the county's decision, concluding that the county could not rely on the mere threat of RLUIPA litigation and must, on remand, adopt an analysis that does not rely on that mere threat or that evaluates whether the existing Goal 5 program is inconsistent with RLUIPA. On review, the county argues that LUBA ignored the text of OAR 660-023-0010(2) and OAR 660-023-0040(4), which it asserts permitted the analysis that the county undertook. Because we conclude that *458 LUBA's order was not "unlawful in substance," ORS 197.850(9)(a), we affirm.
We begin with the administrative rules that are at the center of the issue presented in this case. Statewide Planning Goal 5 is a land use planning goal to protect natural resources and conserve scenic and historic areas and open spaces. OAR 660-015-0000(5). Local governments are required to apply Goal 5 and the requirements in OAR chapter 660, division 23, when considering a "post-acknowledgment plan amendment," see OAR 660-023-0010(5) (defining "post-acknowledgement plan amendment" or "PAPA"), if the amendment affects a Goal 5 resource, including by "allow[ing] new uses that could be conflicting uses with a particular Goal 5 resource site on an acknowledged resource list." OAR 660-023-0250(3)(b). Under OAR 660-023-0040, the local government must analyze "the economic, social, environmental, and energy (ESEE) consequences that could result from a decision to allow, limit, *319 or prohibit a conflicting use." OAR 660-023-0040(1).[1] The term "ESEE consequences" is defined as "the positive and *320 negative economic, social, environmental, and energy (ESEE) consequences that could result from a decision to allow, limit, or prohibit a conflicting use." OAR 660-023-0010(2). Based on the ESEE analysis, the local government is required to "determine whether to allow, limit, or prohibit identified conflicting uses for significant resources sites." OAR 660-023-0040(5).
Turning to the circumstances in this case, we take the relevant facts from LUBA's order, *459 which the parties do not dispute on review:
"In 1992, during periodic review, the county adopted the WA overlay zone to fulfill its obligations under Statewide Planning Goal 5 (Natural Resources, Scenic and Historic Areas, and Open Space) with respect to significant wildlife resources. The WA overlay zone is intended to conserve all important wildlife areas identified in the Deschutes County Comprehensive Plan as a deer winter range, significant elk habitat, antelope range[,] or deer migration corridor. Deschutes County Code (DCC) 18.88 sets out the regulations that govern uses in areas subject to the WA overlay zone. DCC 18.88.040(A) provides that the uses permitted conditionally by the underlying zone are also allowed as conditional uses in the WA overlay zone, with 10 exceptions set out in DCC 18.88.040(B). As we discuss in more detail below, in adopting the WA overlay zone and the 10 exceptions, the county determined that those 10 exceptions are 'conflicting uses' in the parlance of the Goal 5 rule, which conflict with the wildlife resources protected by the identified wildlife areas, and decided to prohibit those conflicting uses in the WA overlay zone.
"DCC 18.88.040(B) identifies 10 conditional uses that are not permitted in the portion of the WA overlay zone that is designated as deer winter range, significant elk habitat[,] or antelope range, including a '[c]hurch.' DCC 18.88.040(B)(3). DCC 18.88.040(C) allows a church as a conditional use in that portion of the WA overlay zone that is designated as the Bend/La Pine deer migration corridor.
*321 "* * * * *
"The plan and code amendments challenged in the present appeal did not arise from a legislative update or review prompted by the Interagency Wildlife Report,[2 ] but rather from a specific quasi-judicial dispute. * * *
"[After an unsuccessful attempt to have a church allowed on his property, which is in the WA overlay zone], John Shepherd wrote letters to the county threatening to file a lawsuit under the federal Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 USC § 2000 et seq. , unless the county amended DCC 18.88.040(B) to eliminate the prohibition on churches. In written comments to the county, Shepherd wrote that 'the only code amendment that we would accept is a simple removal of the ban on churches in [DCC] 18.88.040(B). Anything else would trigger a RLUIPA lawsuit.'
"Shortly thereafter, county staff initiated proposed amendments to the county comprehensive plan and land use code that would eliminate the prohibition in DCC 18.88.040(B)(3) on churches in deer winter range, significant elk habitat[,] or antelope range. Because the proposed amendments would constitute an amendment of the county's acknowledged Goal 5 program to protect significant natural resources in order to allow a new conflicting use, staff provided an [ESEE] analysis under the requirements of the administrative rule implementing Goal 5, at OAR chapter 660, division 023.
"* * * * *
"On September 28, 2017, the planning commission conducted a public hearing on the staff-initiated amendments. On October 3, 2017, the planning commission voted to recommend that churches continue to be prohibited in the WA overlay zone, and also recommended that the county add several new uses with similar negative impacts to the list of uses prohibited in the WA overlay zone under DCC 18.88.040(B).
"The board of county commissioners then conducted a hearing on the planning commission recommendation, *322 considering five options presented by staff. The board of county commissioners ultimately decided to approve a version of the staff-initiated amendments that eliminates the prohibition on churches in the WA overlay zone as applied to areas designated as deer winter range, significant elk *460 habitat, or antelope range, in effect modifying the county's program to achieve Goal 5 to allow churches without limits as a new conflicting use. On January 3, 2018, the board of county commissioners adopted two ordinances that amend the comprehensive plan natural resource chapter, and relevant DCC provisions to eliminate the prohibition on churches in the WA overlay zone."
In the ESEE analysis conducted by the county, the county included the following "[e]conomic consequences" section to justify its decision to allow churches in the WA overlay zone, without limitation. That section appears to assume, without analysis, that the county's current Goal 5 program violates RLUIPA:
"Permitting churches, consistent with RLUIPA , would have positive consequences by allowing religious institutions, which are nonprofits, to establish a presence in certain areas of the rural county, where they presently are not allowed, and to use land and buildings for religious purposes. Churches also provide valuable contributions to communities in the areas of direct economic contributions, social services and community volunteering, education and civic skills training. Lastly, permitting churches alleviates the risk that the County will be required to expend resources defending an unnecessary RLUIPA lawsuit.
"It could also have negative consequences based on testimony from the Oregon Department of Fish and Wildlife (ODFW). In some parts of the county, mule deer populations may have declined up to 70% since 2000. As a result, the Department made adjustments to hunting seasons so as not to cause additional declines through harvest. Their testimony identified other elements contributing to reductions in mule deer populations tied to human caused habitat reduction, fragmentation, and disturbance on winter range. But there was testimony of other factors as well. ODFW estimates that hunting and wildlife viewing contributed more than $50 million to the Deschutes County economy annually, but no breakout was made to deer viewing or hunting."
*323 (Emphases added.) Other aspects of the county's ESEE analysis also appear to assume that the county's existing Goal 5 program violates RLUIPA, also without any analysis as to whether it did, in fact, violate RLUIPA. For example, in the section on the "[s]ocial consequences" of allowing the conflicting use without limitation, the county stated that "[m]any residents testified during the Planning Commission and Board of County Commissioner public hearings that permitting churches, consistent with RLUIPA , would have positive consequences by preventing discrimination on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation." (Emphases added.)
LandWatch petitioned LUBA for review of the county's decision. Based on the parties' arguments, LUBA described its primary task as follows:
"As framed by the parties, we understand the issue on appeal to be whether it is consistent with OAR 660-023-0040(4) and (5) to consider as a negative economic consequence the possibility that the county could be (1) sued by a private landowner and (2) forced to spend resources to defend its current Goal 5 program, as a basis to ultimately conclude that the program should be modified to provide that a formerly prohibited conflicting use will be allowed without limits. As framed, the issue is strictly a matter of interpretation of state law, specifically OAR 660-023-0040(4) and (5), and one that appears to constitute an issue of first impression."
Thus, LUBA focused on the economic consequences section of the county's ESEE analysis.
LUBA concluded that the threat of potential litigation was an insufficient basis under OAR 660-023-0040(4) and (5)"for the county to abandon or disavow a portion of its acknowledged Goal 5 program." LUBA further stated that, to the extent a county considers threatened litigation as a negative economic consequence, "such consideration can form a basis for modifying the existing Goal 5 program only if the county evaluates and establishes *461 as part of the public ESEE process that its existing Goal 5 program is indeed vulnerable to a legal challenge." LUBA noted that the lack of such a merits analysis also poses a barrier to reviewing *324 the legal sufficiency of the county's decision to modify its Goal 5 program because "the threat of litigation in itself is essentially unreviewable under any legal or evidentiary standard."
After also addressing LandWatch's challenge to the county's decision to allow churches without limitation , LUBA described the entirety of the county's task on remand as follows:
"[R]emand is necessary for the county to adopt an ESEE analysis that either does not rely on the mere threat of RLUIPA litigation, or that actually evaluates whether the existing Goal 5 program is inconsistent with the RLUIPA Equal Terms or Substantial Burden requirements. [In addition, o]n remand the county must consider whether there are measures it can adopt pursuant to OAR 660-023-0040(5)(b) and (c) to reduce impacts on wildlife resources and include those evaluations in the revised ESEE analysis. As part of that analysis, the county may consider, if necessary, whether identified measures would impose a 'substantial burden' on the free exercise of religion."
The county seeks review of the portion of LUBA's order that remands for the county to adopt an ESEE analysis that either does not rely on the threat of RLUIPA litigation or includes an evaluation of the merits of such litigation. The county argues that its decision to address only the threat of RLUIPA litigation, and not the likelihood of the county prevailing in such litigation, was purposeful and permissible under the rules. The county asserts that, consistent with OAR 660-023-0010(2) and OAR 660-023-0040(4), it identified and analyzed an appropriate ESEE consequence because RLUIPA litigation could result if the county did not adopt the proposed amendments and that litigation would have economic and social consequences regardless of the ultimate outcome of that litigation. The county also asserts that LUBA's alternative direction to the county to analyze whether the current Goal 5 program is inconsistent with RLUIPA is "too speculative" to meet the definition of an ESEE consequence.
In response, LandWatch argues that the county's obligation to defend itself against lawsuits "has nothing to do with Goal 5 resources" and, thus, "the risk of litigation in *325 the abstract is not suitable for inclusion in an ESEE analysis." In addition, LandWatch points out that the risk of litigation, with no information about the probability or nature of that risk, provides no information from which the county can determine whether to amend the Goal 5 program and provides no legal or evidentiary basis on which it can be reviewed.
Based on the foregoing, the precise issue we must address on review is whether LUBA's order was "unlawful in substance," ORS 197.850(9)(a), in concluding that the county's ESEE analysis of economic consequences was legally insufficient because it relied on the mere threat of RLUIPA litigation. We conclude that LUBA's order was not unlawful and affirm.[3]
We begin our analysis with OAR 660-023-0010(2), which defines "ESEE consequences" as "the positive and negative economic, social, environmental, and energy (ESEE) consequences that could result from a decision to allow, limit, or prohibit a conflicting use." That broad definition of ESEE consequences, in the abstract, could include considering the potential for litigation as an economic consequence that "could result" from a local government's decision with respect to a conflicting use. See generally Hegele v. Crook County , 190 Or. App. 376, 384, 78 P.3d 1254 (2003) (recognizing under prior *462 version of the rules that "[l]egal consequences potentially qualify as economic and social [consequences]"). However, that definition only identifies what may be a potential ESEE consequence; it does not govern what is an appropriate analysis of such a consequence. For that guidance, we must look to OAR 660-023-0040.
Under OAR 660-023-0040(4), the local government "shall analyze the ESEE consequences that could result from decisions to allow, limit, or prohibit a conflicting use." In *326 doing so, the local government, in its ESEE analysis, "must consider any applicable statewide goal or acknowledged plan requirements, including the requirements of Goal 5." OAR 660-023-0040(4). Thus, the ESEE analysis of the identified ESEE consequences is to be tied to Goal 5 and the existing plan requirements.
In addition, under OAR 660-023-0040(5), the ESEE analysis must support the local government's decision with respect to the conflicting use. Under that rule, to allow a conflicting use, without limitation, the local government's decision must come within the requirements of OAR 660-023-0040(5)(c), which provides:
"A local government may decide that the conflicting use should be allowed fully, notwithstanding the possible impacts on the resource site. The ESEE analysis must demonstrate that the conflicting use is of sufficient importance relative to the resource site, and must indicate why measures to protect the resource to some extent should not be provided, as per subsection (b) of this section."
In that respect, the ESEE analysis must be tied to the Goal 5 resources and relative importance of the resources and the conflicting use.
It is OAR 660-023-0040(4) and (5) that demonstrate that LUBA correctly concluded that the county's ESEE analysis with respect to the threat of RLUIPA litigation was insufficient in this case. The county would have us read the definition of ESEE consequences and the introductory directive in OAR 660-023-0040(4) that the local government "shall analyze the ESEE consequences that could result from decisions to allow, limit, or prohibit a conflicting use," and then stop. The county posits that, under those two sentences, it did what was required-viz. , it identified an economic consequence that "could result" and included it in its analysis. What the county's argument misses, however, is that the rules governing ESEE analyses are more comprehensive than those two sentences. It is the overall structure and directive in those rules that show that the county's analysis in this case is insufficient. The county's bare identification of a potential threat of RLUIPA litigation did not analyze that consequence with respect to the requirements *327 of Goal 5 or, more importantly under these circumstances, with respect to the county's existing Goal 5 program, as required by OAR 660-023-0040(4) and (5) -viz. , the county made no attempt to analyze whether the existing program was actually vulnerable to attack under RLUIPA or to analyze the relative importance of avoiding that consequence with respect to the Goal 5 resources. That the county, in the abstract, may be called upon to defend its land use decisions when they are legally challenged is not a sufficient basis on which to abandon its obligations under the Statewide Planning Goals. The ESEE analysis requires more. Here, LUBA's determination of what more was required was not "unlawful in substance." ORS 197.850(9)(a) ("The court shall reverse or remand the order only if it finds * * * [t]he order to be unlawful in substance[.]"). Hence, if the county intends to rely on the vulnerability of its existing Goal 5 program to challenge under RLUIPA as a justification for its allowance of a conflicting use without limitation, then the county must determine whether its existing Goal 5 program is, in fact, vulnerable to such a challenge. Alternatively, as LUBA explained, the county could remove its reliance on RLUIPA in its ESEE analysis. Accordingly, we affirm.
Affirmed.

OAR 660-023-0040 provides, in relevant part:
"(1) Local governments shall develop a program to achieve Goal 5 for all significant resource sites based on an analysis of the economic, social, environmental, and energy (ESEE) consequences that could result from a decision to allow, limit, or prohibit a conflicting use. This rule describes four steps to be followed in conducting an ESEE analysis, as set out in detail in sections (2) through (5) of this rule. Local governments are not required to follow these steps sequentially, and some steps anticipate a return to a previous step. However, findings shall demonstrate that requirements under each of the steps have been met, regardless of the sequence followed by the local government. The ESEE analysis need not be lengthy or complex, but should enable reviewers to gain a clear understanding of the conflicts and the consequences to be expected. The steps in the standard ESEE process are as follows:
"(a) Identify conflicting uses;
"(b) Determine the impact area;
"(c) Analyze the ESEE consequences; and
"(d) Develop a program to achieve Goal 5.
"* * * * *
"(4) Analyze the ESEE consequences. Local governments shall analyze the ESEE consequences that could result from decisions to allow, limit, or prohibit a conflicting use. The analysis may address each of the identified conflicting uses, or it may address a group of similar conflicting uses. A local government may conduct a single analysis for two or more resource sites that are within the same area or that are similarly situated and subject to the same zoning. The local government may establish a matrix of commonly occurring conflicting uses and apply the matrix to particular resource sites in order to facilitate the analysis. A local government may conduct a single analysis for a site containing more than one significant Goal 5 resource. The ESEE analysis must consider any applicable statewide goal or acknowledged plan requirements, including the requirements of Goal 5. The analyses of the ESEE consequences shall be adopted either as part of the plan or as a land use regulation.
"(5) Develop a program to achieve Goal 5. Local governments shall determine whether to allow, limit, or prohibit identified conflicting uses for significant resource sites. This decision shall be based upon and supported by the ESEE analysis. A decision to prohibit or limit conflicting uses protects a resource site. A decision to allow some or all conflicting uses for a particular site may also be consistent with Goal 5, provided it is supported by the ESEE analysis. One of the following determinations shall be reached with regard to conflicting uses for a significant resource site:
"(a) A local government may decide that a significant resource site is of such importance compared to the conflicting uses, and the ESEE consequences of allowing the conflicting uses are so detrimental to the resource, that the conflicting uses should be prohibited.
"(b) A local government may decide that both the resource site and the conflicting uses are important compared to each other, and, based on the ESEE analysis, the conflicting uses should be allowed in a limited way that protects the resource site to a desired extent.
"(c) A local government may decide that the conflicting use should be allowed fully, notwithstanding the possible impacts on the resource site. The ESEE analysis must demonstrate that the conflicting use is of sufficient importance relative to the resource site, and must indicate why measures to protect the resource to some extent should not be provided, as per subsection (b) of this section."

As part of a periodic review, the county asked for and received a report on wildlife resources from the United States Fish and Wildlife Service, the United States Forest Service, the Oregon Department of Fish and Wildlife, and the United States Bureau of Land Management.

We decline to address the county's argument that LUBA erred in not dismissing LandWatch's fourth assignment of error to LUBA, which raised arguments under the Establishment Clause in the United States Constitution. LUBA had declined to reach that assignment of error because the county's ESEE analysis and new decision on remand could be considerably different from the current one. Because we affirm LUBA's order with respect to the ESEE analysis, we also decline to address the Establishment Clause arguments, which are based on the current ESEE analysis and decision.